**Iline THOMAS, Plaintiff,**

v.

**William HENDERSON, Postmaster General of the United States, Defendant.**

**No. 98–71533.**

United States District Court,
E.D. Michigan,
Southern Division.

April 27, 1999.

George B. Washington, Detroit, MI, for plaintiff.

Geneva Halliday, Detroit, MI, for defendant.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

This sexual harassment case is presently before the Court on a Motion for Summary Judgment filed by Defendant, William Henderson, Postmaster General of the United States, on January 29, 1999. Plaintiff, Iline Thomas, filed the instant action on April 8, 1998, alleging that her supervisor at the Royal Oak District of the United States Post Office, Robert Young, subjected her to both hostile work environment and quid pro quo sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. In the instant motion, Defendant argues that Plaintiff has failed to state a prima facie case of sexual harassment under either a hostile work environment or quid pro quo theory.

The Court held a hearing on Plaintiff's Motion on April 22, 1999. Having heard the oral arguments of counsel, and having reviewed the briefs and supporting documents submitted by the parties, the Court is now ready to rule on Defendant's motion. This Opinion and Order sets forth the Court's ruling.

### II. *FACTUAL BACKGROUND*[1]

On September 30, 1996, the Postal Service retained Plaintiff as a three month temporary casual clerk on the 3:30 p.m. to

---

1. For the purposes of the instant motion for summary judgment, the Court derives the factual background almost exclusively from Plaintiff's lengthy deposition testimony. Plaintiff also provided defense counsel with copies of self-written notes, allegedly documenting incidents involving Mr. Young. In addition, Plaintiff recorded certain conversations with Mr. Young, transcripts of which are attached to Defendant's motion as Exhibit 6.

2:00 a.m. "afternoon shift" at the Central Forwarding Section ("CFS") of the Royal Oak Division.[2] Jeff Nail, a supervisor in the Royal Oak Division, originally hired Plaintiff and served as her supervisor until November 17, 1996, when Mr. Young transferred into CFS as the supervisor for the afternoon shift.[3] Although Mr. Young rehired Plaintiff for an additional three month term effective January 1, 1997, he terminated her on March 17, 1997 for "irregular attendance." [Def. Exhibit 1]. While Plaintiff acknowledges that her attendance record deteriorated beginning in January 1997, she claims that her absences constituted an attempt to avoid Mr. Young's harassment. [Brief in Opposition, p. 9 n. 7]. Between September 30, 1996 and April 1, 1997, twenty-nine employees worked on Mr. Young's shift, all of whom were women. [Pl. Exhibit E, Interrogatory 6].

Plaintiff alleges that within two weeks of Mr. Young assuming his supervisory responsibilities, he began a pattern of harassment by making comments about her job performance, perfume, and personal life, which led her to request and obtain a transfer to the 8:30 p.m. to 5:00 a.m. evening shift in December:

**2.** Defendant submitted employment records indicating that the Postal Service previously retained Plaintiff as a temporary Christmas casual on December 3, 1994 for a period not to exceed 21 days. She was terminated on December 16, 1994 for irregular attendance. [Def. Exhibit 1]. In addition, the records reveal that Red Roof Inn hired Plaintiff for a housekeeping position on March 4, 1996, and terminated her on April 22, 1996 for poor attendance. [Def. Exhibit 3]. In direct conflict with these employment records, Plaintiff's application for employment with the Postal Service, dated September 13, 1996, indicates her employment with Red Roof Inn as March 4, 1996 to present. [Def. Exhibit 2].

**3.** Following a week of training, Mr. Young began supervising Plaintiff's shift on November 24, 1996. Mr. Nail, who supervised the day shift, would usually remain on the premises until "about four or five o'clock," and Plaintiff testified that she considered both Mr.

Q. What had occurred at this time that made you want to get away from him?

A. Well, Bob was always just complaining that I was messing up the mail, and the incident of my perfume smells good and asking me different questions about [my husband], do me and Andre argue, are we mad at each other, you know, why my other kids' last names is different from mine. It was just, you know, things like that.[4]

[Thomas Dep., p. 38]. Plaintiff returned to the afternoon shift two weeks later when the Postal Service canceled the evening shift.

After returning to the afternoon shift, Plaintiff alleges that in January 1997, Mr. Young started playing "cat-and-mouse" with her time card. More specifically, Plaintiff contends that on days when Mr. Nail or another temporary supervisor, Dorothy Harris, were not present, Mr. Young would remove her time card from the proper location before she arrived at work, and then call her over to his desk after giving the other permanent and casual employees their assignments. He would then hold the time card out in front of her and force her to grab for it.[5] Plaintiff

Nail and Mr. Young her supervisors. [Thomas Dep., pp. 35–36].

**4.** Although Plaintiff claims that she requested a transfer to "get away from him," she acknowledges that she never told anyone her alleged reason for wanting a transfer. [Thomas Dep., pp. 38, 40]. She further claims that a co-worker, Ruby Harris, overheard Mr. Young ask about her children's last names and chastised him for asking such a personal question. [Thomas, Dep., p. 44]. The record, however, contains no evidence corroborating this allegation.

**5.** At her deposition, Plaintiff described the first cat-and-mouse incident as follows:
Q. The first time this happened, the time card is in his hands, what happened next?
A. I went over to his desk. After he gave the casuals and the regulars their assignments, we went over to his desk and he sat down and he took the time card and he did like this with it.

alleges that Mr. Young played cat-and-mouse with her time card "several times," including on one occasion when Plaintiff states that he inappropriately stroked her hand while she grabbed for the card.[6] [Thomas Dep., pp. 179–180].

Plaintiff also contends that on three occasions Mr. Young briefly touched her leg and inner thigh in a sexually suggestive manner during conversations at his desk, which was located on the work room floor but partially obstructed from the view of other employees by machinery and other items. Mr. Young does not recall touching Plaintiff's leg, but states that it "does not sound totally out of character that I would touch someone to get their attention." [Young Dep., p. 80]. For the sake of thoroughness, the Court will detail Plaintiff's descriptions of these three incidents.

According to Plaintiff, the first incident occurred in early January 1997, when Mr. Young allegedly touched Plaintiff's leg while commenting on her perfume:

A. ... After sending everybody to do their assignments, he told me to sit at his desk. I'm sitting here. He brings his chair over, slides in front of me and he stoops down.

Q. Is he sitting in the chair?

A. He's sitting in the chair. It's like a rolling chair and he stoops down in front of me and he tells me my

Q. Held it out to you?
A. Held it out to me. When I went to grab it, he snatched it back.
Q. Then, what happened?
A. Then, I just looked at the ceiling, like this.
Q. Kind of disgusted?
A. Yes.
Q. Then, what happened?
A. He did it again and held the time card out. When I went to grab the time card, he snatched it back and I grabbed it, and he was standing there and he was smiling and I walked away.
Q. Did anything else happen at that time?
A. No.
[Thomas Dep., pp. 47–48]. Plaintiff claims that in discussing this incident with co-work-

perfume smells good, with his hand on my leg.

Q. What were you wearing at that time?

A. The clothing?

Q. Yes.

A. Pants. I don't remember the color or nothing. It was like a pants and T-shirt. He put his hands on my leg and told me my perfume smelled good. I shifted up in my seat. I went back like this, and that's when he slid back around his table. I didn't know what to do. I was just sitting here. I'm not prejudiced or nothing like that, it was just the touch of his just made me sick. I'm just sitting there and he was like smiling and told me to go on and do my assignment. I went to do my assignment, but before I sat down, I went to the bathroom and I started to cry.

The second incident allegedly occurred in late January, when Plaintiff claims that Mr. Young startled her by coming up behind her and whispering in her ear, "Take your break at five-thirty." [Thomas Dep., p. 89]. After the break, he called her over to his desk where the following purportedly occurred:

Q. I want to focus on the day that Mr. Young came up and whispered in your ear about what time to take

ers a few days later, Wanda Thurman told her that "I think he likes you," to which she allegedly replied, "I don't like him, he's ugly." [Thomas Dep., pp. 50–51]. Plaintiff further testified that another co-worker, Antoinette Harriday, said that "Bob was always staring at her [Antoinette], making her feel uncomfortable." [Thomas Dep., pp. 51–52]. Once again, however, the record contains no evidence corroborating the aforementioned statements by co-workers.

6. Mr. Young concedes that he may have played cat-and-mouse with Plaintiff's time-card, but denies ever reaching out and grabbing or attempting to hold her hand. [Young Dep., p. 74].

your break and you said you jumped. What happened after that?

A. After that, he started walking away smiling, like it was funny. Then, lunch time came and he gave everybody their assignments except for me. He would tell me to sit at his desk and then again, he proceeded to touch me and said that I couldn't wear this perfume anymore. First, he said I had an attitude, my attitude was bad, and I didn't say anything. Then, he said the perfume I had wore, the last time I had wore it—I couldn't wear it anymore, because it was hazardous to him.

Q. Did he tell you anything else about why you couldn't wear the perfume?

A. He said it made him cough and sneeze, I guess the perfume was in his throat or something and he couldn't speak.

Q. Did he tell you that other employees had complained about it?

A. Yes. He said he had a lot of complaints that others were saying my perfume was real strong. I said, "You mean to tell me if I get up and walk to the end of the hall, you can smell my perfume?" And he was like "Yeah." I sniffed it myself and I was like, "I don't think so," because my perfume was not that strong. I said, "You mean if I get up and walk down to the end of the hall, can you smell my perfume?" And he was like, "Yeah, don't wear it anymore." When he said that, he had his hand on my inner thigh again and I proceeded to move, and that's when he said I had a bad attitude and I needed to work on it.

[Thomas Dep., pp. 90–92].

The third and final incident allegedly took place in late February, when Plaintiff claims that Mr. Young again called her over to his desk:

Q. What happened on that occasion?

A. He was just running it down. He was like, "When you come in here, your attitude is lousy, you have lousy excuses." And I started looking up at the ceiling, because I didn't want to hear what he had to say. So he rolled his chair around and he went to stoop down and put his hand on my thigh again, and I moved, I jumped back.

Q. When you say he stooped down, how far down did he stoop? You have to tell it, so the court reporter can write it down.

A. Like his face was like on the level of my chest. Then, he said like what I'm saying right now, "I don't like your attitude." And I said, "I don't like your attitude."

Q. This is where he was sitting talking to you, when you were looking at the ceiling?

A. Yes. I was sitting up like this and he had his hand like on my thigh. I was looking at the ceiling, like that. He said, "I don't like your attitude." I said, I don't like your attitude. And we just went back and forth.

Q. Did you tell him to remove his hand from your thigh?

A. I was too scared. I was too scared to say anything. I mean it's the way—the look that he gave, it just spooked me. I just didn't say anything. I didn't want to lose my job because I needed it.

Q. But you didn't hesitate to say to him, "I don't like your attitude."

A. That wasn't going to get me fired, by me saying, "I don't like your attitude." I figured if I said "I don't want you touching me," or something like that, he may say okay, well, leave, go home, and I couldn't afford to lose my job. I

know it sounds crazy and weird but that's the way it happened.

[Thomas Dep., pp. 122–124].[7]

During each of the three touching incidents described above, Plaintiff acknowledges that Mr. Young was looking at her face and talking to her about "work-related things," and that she would stare at the ceiling or wall to avoid eye-contact.[8] [Thomas Dep., p. 184–185]. She further states that on each occasion, his hand was on top of her leg with fingers going down toward her inner thigh, and that the contact lasted just a matter of seconds:

Q. The last time you testified that on three occasions, when you were sitting in the chair at the end of Mr. Young's desk, he pulled his chair around in front of you. You said that he was talking to you and on three occasions that he placed his hand on your thigh; is that correct?

A. Yes.

Q. That happened three times; is that right?

A. Yes.

Q. Last time, you were sort of demonstrating on your own thigh but I could not see on the other sides of the table. I want you to show me on yourself, if you would, exactly what he did. Was it the same all three times?

A. Yes. I can't do it on myself.

Q. Just try to show me. What did he do? I realize you said you were wearing slacks and now you have on a skirt, but do the best you can.

A. He pulled his chair around and he placed his hand on my thigh here.

Q. Kind of on the top of your leg?

A. Right.

Q. You are placing your hand, to me, on the top of your leg.

MR. WASHINGTON: The top and inside.

BY MS. HALLIDAY:

Q. On top and a little bit down into the thigh area of your leg; is that correct?

A. Right.

Q. How many seconds did he keep his hand there?

A. I can't remember. It wasn't—

Q. Let me ask you this. You previously said that he put his hand on your leg and you jerked; is that correct?

A. I sat up like this.

Q. Did you do that quickly?

A. Yeah.

Q. So like the minute he touched you, the second he touched you, you jerked up; is that correct?

A. Yes.

Q. Did you also testify before that at that point he removed his hand?

A. Yes.

Q. We're talking just a matter of seconds; is that correct?

A. Yes

Q. Was that the same on all three occasions?

A. Yes.

Q. You said, I think, that you never said anything to him directly?

A. Yes.

Q. But you used to look at the ceiling, is that correct?

A. Either the ceiling or the wall.

Q. Was it obvious to him that you were looking away?

A. Yes, because he was like I had a bad attitude, he didn't like my attitude.

[Thomas Dep., pp. 184–185].

---

**7.** Plaintiff testified that she told her godmother Mary Johnson about the second and third incidents, but the record contains no corroborating evidence. [Thomas Dep., p. 92–93, 124].

**8.** Plaintiff's exact deposition testimony was as follows:

Q. He was looking you in the face but he was like stooped over toward you?

A. Yes, with his hand on my inner thigh.

Q. Talking to you about work-related things; is that correct?

A. Yes.

Q. Was it the same situation on all three occasions?

A. Yes.

Q. By that, I mean he placed his hands on your leg with his fingertips going down to toward your thigh?

A. No. Not that far down.

Q. Just more on top?

A. Yes.

Q. He placed his hands on the top of your leg?

MR. WASHINGTON: I don't think that was the gesture she made. It was extending into the middle of the inner thigh, as she just demonstrated it.

MS. HALLIDAY: She just told me that wasn't it.

A. You had your hand like going down.

BY MS. HALLIDAY:

Q. It wasn't down toward your crotch?

A. It wasn't down toward the middle part. It was like here.

Q. He touched the top of your leg with your fingertips just by the sides of them, going down toward your inside thigh?

A. Yes.

Q. You immediately jerked?

A. Yes.

Q. And he immediately withdrew his hand; is that correct?

9. Ms. Saites testified as follows:

Q. There's really no reference, one way or the other here, that I can see as to whether there was touching or not. Do you recall any conversation about whether there was any kind of touching going on?

A. If there was, that would have been a red flag. That would have been written down, either highlighted or in bold or something.

Q. So as far as you remember, she didn't say there was any touching during the course of this conversation?

A. No. At the very most, she said he took her time card and his hand may have grazed hers when she took the time card, which isn't really a red flag.

A. Yes.

[Thomas Dep. Vol II, pp. 19–22].

On March 7, 1997, Plaintiff contacted Sherry Saites at the Equal Employment Opportunity ("EEO") office of the Royal Oak District to complain about Mr. Young. Although Plaintiff claims that she told Ms. Saites that Mr. Young was "touching me in places I didn't like," [Thomas Dep., p. 128], Ms. Saites does not recall any discussion of inappropriate touching during this initial phone conversation.[9] [Saites Dep., p. 51]. Following standard procedures, Ms. Saites mailed out a packet of EEO complaint forms to Plaintiff that same day.[10]

On March 17, 1997, Plaintiff alleges that she "snuck" over to speak with temporary supervisor Dorothy Harris to complain about Mr. Young. She further alleges that Mr. Young saw her speaking with Ms. Harris, which led him to fire her later that same night by trying to get her to sign termination papers without reading them. [Thomas Dep., pp. 135–137].

Q. He was looking under your desk?

A. No. He dropped a piece of tissue by the cage and told me to come to his desk.

Q. What was the significance of him dropping the tissue by the cage?

A. I guess, so he could whisper so, nobody could hear him telling me to come to his desk.

\* \* \* \* \* \*

Q. Right. I understand. And you don't remember whether you asked her specifically about any kind of touching?

A. I wouldn't unless I was led to believe that there was something more there to pull out.

Q. Okay. So there was, as far as you can recall, no discussion, one way or the other, as to whether there was touching in this first phone call?

A. No.

[Saites Dep., pp. 51–52].

10. The complaint forms were returned to the EEO office on April 17, 1997 as unclaimed. The forms were remailed the same day and claimed by Plaintiff on April 19, 1997.

Q. What happened then?

A. I was at his desk and he was like, "Do you remember what we discussed a couple of weeks ago?" I said, "We discussed a lot of things a couple of weeks ago." He was like, "I don't see any improvement. I want you to sign this paper." I was like, "I am not signing nothing I can't read." He was like, "If you don't sign it, I will send it over and tell them you refuse to sign it." I said, "I'm not signing nothing I can't read." I was like, "Do Jeff know what's going on?" He just gave me a crazy look like no, and I was like, "I'm not signing anything until I speak to Jeff." Then, he was just like, "Punch out and go home." So I was like okay. I punched out and I went home.

Q. Did he tell you what was the nature of the paper?

A. He never told me what was on the paper.

Q. Did he tell you he was terminating your casual employment?

A. They didn't tell me anything? [sic] He just told me to sign this paper. He had his hand over it. He had it covered and he told me to sign it and I wasn't going to sign anything I couldn't read.

Q. Did anybody else witness this?

A. They didn't see it, but after he told me to punch out and go home, I went and grabbed my coat and book bag and I went over to Antoinette [Harriday] and I told her.

11. Plaintiff's counsel directs the Court to Ms. Gracey's report, where she indicated that "Psychiatric evaluation is a must." Counsel fails to note, however, that the report also details problems Plaintiff was having with her husband, and indicates that Plaintiff's fears of Mr. Young following her may be "linked to client's paranoia." [Pl. Exhibit G].

12. In a Rule 56(f) affidavit submitted to the Court, Plaintiff's counsel states that he could

[Thomas Dep., pp. 136–137]. Mr. Young then proceeded to submit an Employee Evaluation and/or Probationary Report recommending Plaintiff's dismissal for irregular attendance. The report includes a notation from Mr. Young, dated 3/17/97 at 11:47 p.m., providing "Employee refused to sign." [Def. Exhibit 1].

On April 15, 1997, Plaintiff met with an EAP counselor, Viviane Gracey, telling her that Mr. Young "touched me, he used to rub my legs, my things, and my hands." [11] [Pl. Exhibit G, Counselor Report]. Plaintiff then scheduled an EEO interview with Ms. Saites for April 25, 1999, during which she alleged that Mr. Young had called her to his desk and inappropriately touched her. Ms. Saites responded by conducting interviews of other women employees in Central Forwarding. Although Ms. Redd refused to speak with Ms. Saites, she has submitted a sworn affidavit alleging that on one occasion Mr. Young shined a work light on her breasts. [Pl. Exhibit H]. Three other employees, Karen Hulley, Kim Sanders, and Dora Carden, told Ms. Saites that Mr. Young has made inappropriate sexual comments. [12] [Pl. Exhibit B, notes attached to Saites Dep.].

Plaintiff then proceeded to file an EEO Complaint of Discrimination, dated June 20, 1997, alleging sex discrimination and providing: [13]

My supervisor, Robert Young, engaged in sexual harassment of me including unwanted touching, unwanted comments, and discriminatory and retaliatory job assignments. Finally, on March 14, he terminated me because I would not go along with what he wanted.

not obtain affidavits from Ms. Hulley, Ms. Sanders, and Ms. Carden corroborating their allegations, but that he believes they would testify consistent with their statements to Ms. Saites. [Pl. Exhibit J].

13. Although Plaintiff checked the box for sex discrimination on the EEO complaint form, she did not check the box for retaliation.

[Complaint Exhibit 1]. The Postal Service reassigned Mr. Young to another work area pending the outcome of the investigation. At the end of the investigation, no cause was found for disciplining Mr. Young.[14]

### III. *ANALYSIS*

#### A. *Standards Applicable to Motions for Summary Judgment*

Summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[15] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply the foregoing standards in deciding Defendant's

---

**14.** Plaintiff states that she has made two attempts at suicide and was hospitalized in August 1997. She is also currently in treatment and on medication at New Center Community Mental Health. [Brief in Opposition, p. 11].

**15.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

Motion for Summary Judgment in this case.

### B. *Plaintiff's Sexual Harassment Claims*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). As noted by the Sixth Circuit, courts recognize two forms of workplace sexual harassment which constitute discrimination based on sex: (1) "quid pro quo" harassment, in which a supervisor requests sexual favors in exchange for job benefits; and (2) "hostile work environment" harassment, in which a pervasive atmosphere of sexual harassment creates an objectively hostile work environment. *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 872 (6th Cir.1997). In the present case, Plaintiff alleges that Defendant is liable for both forms of sexual harassment by her supervisor Robert Young.

### 1. *Hostile Work Environment Harassment*

■ In order to state a prima facie case of hostile work environment sexual harassment, an employee must demonstrate that:

(1) the employee is a member of a protected class; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment; and (5) the existence of respondeat superior liability.

*Barnes v. Montgomery County Board of Education,* 1997 WL 253279, *2 (6th Cir.(Ky.)) (unpublished decision) (quoting *Fleenor v. Hewitt Soap Company,* 81 F.3d 48, 49 (6th Cir.), cert. denied, 519 U.S. 863, 117 S.Ct. 170, 136 L.Ed.2d 112 (1996)).

■ In a series of decisions, the Supreme Court has clarified that hostile work environment sexual harassment only becomes actionable if the alleged conduct is "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (internal quotation marks and citation omitted). The *Meritor* standard was reaffirmed and expounded on in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), which instructed that the question of whether conduct is sufficiently severe or pervasive must be judged by both an objective and an subjective standard:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

510 U.S. at 21–22, 114 S.Ct. at 370.

■ No "mathematically precise test" exists for judging whether an environment is objectively hostile or abusive and, thus, the determination requires an examination of all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.,* at 22–23, 114 S.Ct. at 371. As summarized by Justice Scalia in the Supreme Court's recent unanimous decision in *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998):

The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it for-

bids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.... We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.'

\*    \*    \*    \*    \*    \*

The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

118 S.Ct. at 1003.

Returning to the present case, the Court initially notes that, standing alone, Plaintiff's allegations that Mr. Young caressed her hand while playing cat-and-mouse with her time card, and that he asked intrusive questions about her perfume, family and personal problems fall outside the purview of Title VII. This chicanery and commentary amount to, at most, nothing more than the horseplay and offensive utterances which, while distasteful, do not rise to the level of actionable sexual harassment.

That said, the Court must view Mr. Young's conduct in light of all the circumstances, and the allegation that Mr. Young also touched Plaintiff's leg and inner thigh on three different occasions presents a far more difficult question. Applying the *Harris* standard, Defendant asserts that under any objective assessment, Mr. Young's conduct did not create a sufficiently severe and sustained hostile work environment to support a harassment claim.

More specifically, Defendant argues that even assuming the veracity of Plaintiff's allegations, it is not unreasonable or sexual in nature for a male supervisor to briefly touch the leg of a female employee to get her attention, if the employee insists on looking away at the ceiling during a conversation about work-related issues.

Q. Can you think of any reason you would have ever touched her on her legs?

A. Well, I indicated a lot of times when I talked to her, her body language was like she would be turning away and looking away and I would be trying to speak with her and I may have tapped her on the knee to get her attention.

\*    \*    \*    \*    \*    \*

Q. Do you remember lightly tapping her on the knee?

A. No, not specifically, but it sounds like something certainly that I would do to get her attention.

[Young Dep., pp. 77–78].

If defendant had only touched Plaintiff on one occasion, or perhaps even just tapped her on the knee, the Court might agree. In actuality, however, Plaintiff alleges that Mr. Young touched her leg and inner thigh on three different occasions within approximately a two month period, even though each time she shifted up in her chair to avoid the contact. Moreover, rather than orally instructing Plaintiff to pay attention, or touching her on a less suggestive area of her body such as the shoulder or arm, Mr. Young allegedly placed his hand on top of Plaintiff's leg with his fingers going down toward her inner thigh, an action which contains obvious potential sexual connotations. Finally, Plaintiff expressly alleges that the decline in her attendance record coincided directly with Mr. Young's harassment. In sum, Plaintiff's allegations, if true, involve frequent, severe, and sexually suggestive conduct in the workplace that negatively impacted on her job performance.

Accordingly, the Court finds the record sufficient to raise a question of fact as to whether Mr. Young's conduct created an objectively hostile work environment. Plaintiff alleges that on three occasions within approximately two months, Mr. Young touched her leg and inner thigh, albeit briefly, in a sexually suggestive manner. In light of Plaintiff's other allegations, including her claim that Mr. Young inappropriately stroked her hand on one occasion, a reasonable person in Plaintiff's position could find such conduct severely hostile or abusive.

### 2. *Quid Pro Quo Harassment*

■ In order to state a prima facie case of quid pro quo sexual harassment, an employee must demonstrate:

(1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

*Kauffman v. Allied Signal, Inc., Autolite Div.,* 970 F.2d 178, 186 (6th Cir.1992) (quoting *Highlander v. KFC Nat. Management Co.,* 805 F.2d 644, 648 (6th Cir.1986)); *See also, Richmond–Hopes v. City of Cleveland,* 1998 WL 808222, *4 (6th Cir. 1998) (unpublished opinion).

■ On its face, Plaintiff's quid pro quo claim seems fatally flawed in that Plaintiff does not allege that Mr. Young ever requested sexual favors in return for job benefits. Indeed, Plaintiff acknowledges that Mr. Young never asked her on a date or out to lunch, never came over to her house, never overtly suggested that he wanted a sexual relationship with her, and never told her that her job or assignments were contingent on letting him touch her. [Young Dep. Vol II, pp. 23–26]. Plaintiff argues, however, that the Court should imply a quid pro quo claim from the conduct by Mr. Young that supports her hostile work environment claim, coupled with her termination. More specifically, Plaintiff contends that Mr. Young's efforts to touch her leg and inner thigh constituted implied requests for sexual favors, and that Mr. Young fired her because she spurned these sexual overtures.

To accept Plaintiff's argument, however, would mean that anytime a prima facie hostile work environment claim was accompanied by an adverse employment action, a plaintiff would automatically state a prima facie case of quid pro quo sexual harassment. Sixth Circuit case law does not support such a result and, contrary to Plaintiff's assertions, the Court does not read *Oncale, supra,* to obviate the distinction between hostile work environment and quid pro quo sexual harassment.

■ In the Court's view, a quid pro quo claim requires some evidence that, from an objective perspective, the alleged conduct carried with it an express or implied request for sexual favors in return for some action affecting the plaintiff's terms or conditions of employment. Without such stated or implied conditions of reciprocity, the offensive conduct is simply that: action which is harassing and offensive, but not a quid pro quo request. The Court reasonably reads Plaintiff's Complaint and Deposition to allege that Mr. Young engaged in a pattern of sexually harassing conduct which directly affected her work performance and eventually led to her discharge for irregular attendance. While such allegations do support a hostile work environment claim, they do not support a claim for quid pro quo sexual harassment as a matter of law.

## IV. *CONCLUSION*

For all of the aforementioned reasons:

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is DENIED with respect to Plaintiff's hostile work environment claim, and GRANTED with respect to Plaintiff's quid pro quo claim.